IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KELVIN M. THOMAS, et al.,

        Plaintiffs,

v.                              Civil Case No. 3:13-cv-825

FTS USA, LLC, et al.,

        Defendants.

### MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' MOTION FOR CLASS CERTIFICATION (ECF No. 91). For the reasons set forth below, the motions to certify both classes will be granted in part and denied in part.

### BACKGROUND

#### A. Procedural Background

On December 11, 2013, Plaintiff Kelvin Thomas ("Thomas") filed a class action complaint on behalf of himself and all others similarly situated, alleging that defendant FTS USA, LLC ("FTS"), a subsidiary of Unitek Global Services, Inc. (("Unitek"); collectively, "Defendants") had violated the Fair Credit Reporting Act ("FCRA"). (Complaint ("Compl.") (ECF No. 1)). The Complaint alleges four Counts under the FCRA. Counts One and Two allege violations of § 1681b(b)(2)(A)(i) and (ii), respectively. Section 1681b(b)(2)(A) provides that:

1

> a person may not procure a consumer report,
> or cause a consumer report to be procured,
> for employment purposes with respect to any
> consumer, unless: (i) a clear and
> conspicuous disclosure has been made in
> writing to the consumer at any time before
> the report is procured or caused to be
> procured, in a document that consists solely
> of the disclosure, that a consumer report
> may be obtained for employment purposes; and
> (ii) the consumer has authorized in writing
> (which authorization may be made on the
> document referred to in clause (i)) the
> procurement of the report by that person.

Counts Three and Four allege violations of §§ 1681b(b)(3)(A)(i) and (ii), respectively. Those sections require that:

> In using a consumer report for employment
> purposes, before taking any adverse action
> based in whole or in part on the report, the
> person intending to take such adverse action
> shall provide to the consumer to whom the
> report relates: (i) a copy of the report;
> and (ii) a description in writing of the
> rights of the consumer under this
> subchapter, as presented by the Bureau under
> Section 1681g(c)(3) of this title.

The Court denied Defendants' Motion for Summary Judgment on February 24, 2015. (ECF No. 59). Thomas filed this Motion for Class Certification on October 16, 2015. (ECF No. 91). Defendants have opposed the motion. (ECF No. 99). Thomas has replied. (ECF No. 100). The matter is therefore now ripe for decision.

### B. Factual Background

In September 2009, Thomas obtained a job with Cableview Communications, which was purchased by FTS in the fall of 2011.

2

(Compl. ¶¶ 27-30).   Defendant Unitek is the parent company of

FTS.   In order to continue his employment with FTS, on January

17, 2012, Thomas signed an "Employment Release Statement," which

provides, in pertinent part:

> Prior to and for the duration of my
> employment with FTS USA, LLC (the
> "Company"), I understand that investigative
> background inquiries are going to be made on
> myself [sic].  I understand that the Company
> will be requesting information from various
> Federal, State, Local and other agencies
> which maintain records concerning my past
> activities relating to my driving history,
> credit, criminal, civil, and other
> experiences.  These reports may also include
> inquiries regarding my educational history
> and past work experience and performance
> including reasons for termination of
> employment.
>
> I authorize, without reservation, any party
> or agency contacted by the Company or its
> agents to furnish any of the above mentioned
> information or any other information
> requested.

(Plaintiffs' Memorandum in Support of Motion for Class

Certification ("Pl. Mem.") (ECF No. 92) Ex. 1).   This was

Unitek's standard disclosure form, provided to all prospective

employees during the relevant class period.   (Deposition of

Steven Conlin ("Conlin Dep." at 58).

    After its acquisition of Cableview, FTS required every

Cableview employee who wished to continue employment with FTS to

undergo a background check.   (Defendant's Memorandum in Support

of Summary Judgment ("Def. SJ Mem.") (ECF No. 38), Statement of

Undisputed Facts ¶¶ 7-10). Unitek's internal hiring policies provided that "[a] pending employee may not be eligible for hire" if the employee has been charged with or convicted of certain felonies, misdemeanors, driving offenses, or other "unacceptable" crimes. Id. at ¶¶ 11-12.

On or about January 20, 2012, Unitek, which performed "all consumer report-related functions on behalf of itself and...FTS," ordered a background check on Thomas from Backgroundchecks.com ("BGC"), a consumer reporting agency. (Pl. Mem. at 3; Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("Def. Mem. in Opp.") (ECF No. 99), Ex. D). The report contained numerous felony convictions, including convictions for distribution of marijuana, money laundering, statutory rape, and carnal knowledge of a juvenile, all of which were incorrectly attributed to Thomas. Id. The report also revealed that Thomas' driving record contained several moving violations, as well as a report of a 2011 accident in which Thomas was at fault. Id. Shortly thereafter, BGC informed FTS that the criminal violations were erroneously included in Thomas' report, but that the entries pertaining to the car accident and the moving violations did, in fact, belong to Thomas. (Def. SJ Mem., Ex. E).

4

On March 12, 2012, Thomas' supervisor informed Thomas that, as a result of his driving record, he was ineligible for the position for which he had applied. (Def. SJ Mem. Exs. E, F; Conlin Dep. at 136). On that same date, an FTS representative provided Thomas with a copy of the updated BGC background check. (Def. SJ Mem., Statement of Undisputed Facts ¶ 29). Thomas never received a copy of the background check prior to this date, and at no time did FTS provide Thomas with a summary of his rights under the FCRA. In fact, Unitek's representative testified that neither FTS nor Unitek ever provided either of these documents to current or potential employees, because it was Unitek's understanding that BGC would provide the required notices. (Conlin Dep. at 105, 119, 123).

## C. The Proposed Classes

Thomas seeks to certify one class and one sub-class. The first class, which Thomas calls the "Impermissible Use Class", is defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendants or any of their subsidiaries, and as part of this application process were the subject of a consumer report obtained by Defendants, (a) where the defendants failed to provide a written disclosure as stated at 15 U.S.C. § 1681b(b)(2)(A)(i) to the applicant that they intended to obtain a consumer report for employment purposes, (b) and where as a

> result the Defendants failed to obtain a
> proper written authorization as stated at 15
> U.S.C. § 1681b(b)(2)(A)(ii) signed by the
> applicant prior to obtaining the consumer
> report.

(Pl. Mem. at 8).

Thomas also seeks to certify a sub-class pursuant to Section 1681b(b)(3), defined as follows:

> All natural persons residing in the United
> States (including all territories and other
> political subdivisions of the United
> States), who applied for an employment
> position with Defendants or any of their
> subsidiaries, and as part of this
> application process were the subject of a
> consumer report obtained by Defendants, (a)
> where the defendants failed to provide a
> written disclosure as stated at 15 U.S.C. §
> 1681b(b)(2)(A)(i) to the applicant that they
> intended to obtain a consumer report for
> employment purposes, (b) and where as a
> result the Defendants failed to obtain a
> proper written authorization as stated at 15
> U.S.C. § 1681b(b)(2)(A)(ii) signed by the
> applicant prior to obtaining the consumer
> report, and (c) to whom Defendants did not
> provide a copy of the consumer report as
> stated at 15 U.S.C. § 1681b(b)(3)(A)(i) at
> least five business days before the date the
> employment decision is first noted in
> Defendants' records, (d) and to whom
> Defendants did not provide a written summary
> of Fair Credit Reporting Act rights as
> stated at 15 U.S.C. § 1681b(b)(3)(A)(ii) at
> least five business days before the date the
> employment decision is first noted in
> Defendant's records.

Thomas' proposed sub-class refers to "employment decisions," but does not specify that the class includes only members for whom Defendants made "adverse" employment decisions.

6

This appears to be an oversight; elsewhere in his briefing, Thomas states that "the FCRA § 1681b(b)(3) Subclass is comprised of the individuals from the Section 1681b(b)(2) Class for whom Defendants took an adverse employment action without providing the required notices before it did so." (Pl. Mem. at 11) (emphasis added).   There is no basis in the FCRA or in the relevant jurisprudence to suggest that notices are required before a user of a consumer report makes any employment decision, adverse or otherwise; nor does Thomas take that position in his briefs.   The relevant section pertains only to "adverse" employment actions.   Therefore, the class definition will be amended to reflect this change.   More specifically, it appears that the adverse action contemplated by the parties is that Defendants found an applicant ineligible for the position for which he or she had applied based on the consumer report provided.   Accordingly, hereafter this Opinion treats the Section 1681b(b)(3) Subclass ("the Adverse Action Subclass") as including only those individuals whom Defendants found ineligible for employment based on their pre-employment (or pre-retention) background checks.

Also, neither of Thomas' proposed class definitions specifies a class period.   Defendants point out that class counsel agreed to a two-year class period at a status hearing on June 4, 2015.   (Def. Mem. in Opp. at 10 n.7 (citing Transcript

of June 4, 2015 Status Hrg. at 25)). Thomas does not address the point at all in his briefs. Therefore, the class definitions will both be amended to reflect that the class contains only those individuals who applied for an employment position with Defendants within the two years immediately preceding the filing of the Complaint in this matter on December 11, 2013.

Counts One and Two of the Complaint are asserted on behalf of the Impermissible Use Class, and Counts Three and Four are asserted on behalf of the Adverse Action Subclass.

## CLASS CERTIFICATION DISCUSSION

To obtain class certification, a plaintiff must satisfy the four requirements of Fed. R. Civ. P. 23(a). Additionally, the proposed class must be consistent with at least one of the types of class actions delineated in Fed. R. Civ. P. 23(b), and must meet the corresponding prerequisites for certification. Because Thomas proposes two different classes for certification, each requirement will be addressed in the context of each individual class. Defendants do not contest that the Numerosity, Commonality, or Superiority elements are satisfied for either class.

## A. Rule 23(a)

Rule 23(a) has four requirements for class certification. They are that: (1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the representative's claims or defenses are typical of those of the class; and (4) the representative will fairly and adequately represent the interests of the class. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998).   The plaintiff bears the burden of proving all requirements of Rule 23.   Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001).

As the Fourth Circuit has explained, courts are not required "to accept plaintiffs' pleadings when assessing whether a class should be certified." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365 (4th Cir. 2004).   Rather, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006) (quoting Gariety, 368 F.3d at 365).   "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case," but "[t]he likelihood of the plaintiffs' success on the merits...is not relevant to the issue of whether certification is proper." Id. (internal citations omitted).

The Supreme Court recently elaborated further upon the factual determinations at the class certification stage in Wal-

Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011).  In Dukes, the Supreme Court explained:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in Falcon that 'sometimes it may be necessary for the court to prove behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'

131 S. Ct. at 2551 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160-61 (1982) (emphasis in original)).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped."  131 S. Ct. at 2551.

After Dukes, which "laid the groundwork for the heightened 'rigorous analysis' required of a class certification petition that 'will entail some overlap with the merits of the plaintiff's underlying claim,'...the Supreme Court issued a pair of 2013 opinions clarifying the extent to which a court can address merits issues at the class certification stage." Timothy Coughlin & Barbara A. Lum, Digging Deeper: Mass Toxic Tort Class Certification After Dukes, Comcast, and Amgen, 80 Def. Couns. J. 428, 432 (Oct. 2013).  The first of these

10

decisions was Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 113 S. Ct. 1184 (2013). In Amgen, the Court clarified that,

> [a]lthough we have cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Id. at 1194-95 (internal citations omitted). Thus, Amgen and Dukes demonstrate that a court's factual determinations at the class certification stage should go only as far as necessary and no farther. That is, "Amgen appears to limit inquiry into a case's merits where the class certification inquiry touches upon an indispensable element of the claim and on which a failure of proof would end the case." Coughlin & Lum, at 432 (internal citations omitted).

The second class certification case of 2013 was Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). In Comcast, the Supreme Court further clarified "that the 'rigorous analysis' required for class certification reaches not only to issues of liability, but also to damages and causation." Coughlin & Lum, at 432. This position "reaffirms Dukes' pronouncement that

11

district courts considering motions for class certification often must look beyond the pleadings to issues that overlap with the merits. But again, the extent to which a court must delve into the merits remains undefined." Id. at 433.

Newberg on Class Actions also analyzed two of the latest Supreme Court decisions, noting that although Dukes seems to "encourage merits review at certification," a different majority in Amgen cautions against "free-ranging merits inquiries at the certification stage", and stating that merits questions "may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." William B. Rubenstein, Newberg on Class Actions § 7:23 (5th ed. 2013).

Keeping in mind the Supreme Court's views in Dukes, Amgen, and Comcast, we examine the definition of the proposed classes.

### 1. Ascertainability of the Proposed Class

Rule 23 states that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). This is in addition to the certification requirements listed in Rule 23(a). "The definition of the class is an essential prerequisite to maintaining a class action." Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976); see also Kirkman v. N.C. R. Co., 220 F.R.D. 49, 53 (M. D.N.C. 2004). "The court should not certify a

12

class unless the class description is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" Solo v. Bausch & Lomb Inc., 2009 WL 4287706, at *4 (D.S.C. Sept. 25, 2009) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Proc. § 1760 (3d ed. 2005)).

In a recent decision, the Fourth Circuit explained that "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." EQT Production Co v. Adair, 2014 WL 4070457, *7 (4th Cir. 2014); see also Wm. Moore et al., 5 Moore's Federal Practice § 23.21[1] (3d ed.) ("A class action is possible only when the class definition provides a court with tangible and practicable standards for determining who is and who is not a member of the class."). Although "plaintiffs need not be able to identify every class member at the time of certification," if "class members are impossible to identify without extensive individualized fact-finding or 'mini-trials', then a class action is inappropriate." EQT, 764 F.3d at 358.

### a. The Impermissible Use Class

Thomas argues that the Impermissible Use class satisfies the ascertainability requirement because Defendants "have confirmed that they maintain files and records on applicants and that, should the Court grant this Motion, they will be able to

13

identify individual Class Members." (Pl. Mem. at 11). Defendants do not argue that the Impermissible Use class is not ascertainable.

Defendants have admitted that FTS conducts background checks on all prospective employees, and prior to doing so provides each prospective employee with an Employment Release Statement. (Def SJ Mem., Statement of Undisputed Facts ¶¶ 8-16). Unitek has also admitted that it used the same Employment Release Form for all subsidiaries throughout the class period, and that it maintains electronic copies of all signed Employment Release Statements. (Conlin Dep. at 58, 68-69, 140). Thus, the Impermissible Use class is readily ascertainable.

### a. The Adverse Action Subclass

Thomas argues that the Adverse Action Subclass is ascertainable for the same reasons the Impermissible Use Class is ascertainable: Defendants keep records of their employment decisions, and therefore will be able to identify the relevant class members without difficulty. (Pl. Mem. at 11). Defendants do not contest otherwise. Moreover, Defendants' summary judgment evidence and deposition testimony reveal that Unitek keeps records of whether and why employees were found ineligible for the positions for which they applied. (Def. SJ Mem. Ex. E; Conlin Dep. at 140). Thus, the Adverse Action Subclass is also readily ascertainable.

14

## 2. Rule 23(a)(1) Numerosity

Rule 23(a)(1) provides that the second of the requirements for a class action is that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action under Fed. R. Civ. P. 23; [rather], application of the rule is to be considered in light of the particular circumstances of the case[.]" Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967) (finding that a class of 18 was sufficient to fulfill the numerosity requirement). "Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. 2000) (internal quotation omitted).

Defendants do not dispute that the numerosity requirement is satisfied for either class. Unitek's representative testified that Defendants procured approximately 10,000 reports per year for employment purposes during the relevant time period, and they refused to hire about 3,000 applicants per year based on the contents of the applicants' reports. (Conlin Dep. at 76-78, 127-28). Thus, both classes easily satisfy the numerosity requirement.

### 3. Rule 23(a)(2) Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); Lienhart, 255 F.3d at 146. The commonality requirement focuses on the claims of the class as a whole, and it "turn[s] on questions of law [or fact] applicable in the same manner to each member of the class." Califano v. Yamasaki, 442 U.S. 682, 701 (1979). To satisfy this requirement, there need be only a single issue common to the class. See Cent. Wesleyan Coll. v. W.R. Grace & Co., 143 F.R.D. 628, 636 (D.S.C. 1992), aff'd, 6 F.3d 177 (4th Cir. 1993). The Dukes decision, which focuses primarily on the issue of commonality, states in part:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." This does not mean merely that they have all suffered a violation of the same provision of law.
>
> ***
>
> [The proposed class members'] claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Dukes, 131 S. Ct. at 2551.

16

### a.    The Impermissible Use Class

Thomas alleges that the Impermissible Use class satisfies the commonality requirement because it presents two common issues of law or fact, namely: "(1) whether Defendants' Employee Release Statement violated Section 1681b(b)(2) because (a) it failed to disclose that a consumer report would be obtained from a consumer reporting agency and (b) thus it failed to obtain a valid authorization to obtain such a report for an employment purpose," and (2) "whether these violations are willful." (Pl. Mem. at 13-14). Defendants do not assert that Thomas cannot satisfy commonality as to his Impermissible Use Class claims.

This Court has held previously that the question of whether a standard waiver form violated § 1681b(b)(2) was a common question satisfying Rule 23's "commonality" requirement. See Manuel v. Wells Fargo, 2015 WL 4994549, at *9-10 (E.D. Va. Aug. 19, 2015); Milbourne v. JRK Residential Am., LLC, 2014 WL 5529731, at *5 (E.D. Va. Oct. 31, 2014) ("JRK has admitted that it has used a standardized waiver and disclosure form for all class members, including Milbourne. Thus, if Milbourne is able to establish that JRK's waiver did not satisfy § 1681b(b)(2)'s requirements this issue will be resolved not only in Milbourne's favor, but in the favor of all class members. Thus, the legality of the forms is of 'such a nature that it is capable of class wide resolution' and satisfied the commonality requirement

for the Impermissible Use Class." (quoting Dukes, 131 S. Ct. at 2251.)). This case presents an identical claim under § 1681b(b)(2). Therefore, for the same reasons set forth in Manuel and Milbourne, the common question of whether Defendants' standard Employment Release Statement violated the FCRA satisfies the commonality requirement.

In addition, "[t]he question of willfulness is also a common question...[when] [t]here is no contention that [Defendant's] state of mind as to individual consumers varied in any way." Manuel, 2015 WL 4994549, at *9; Milbourne, 2014 WL 5529731, at *6. Thomas also presents a willfulness question in this case, and Defendants have presented no evidence that their state of mind varied in any way during the class period in question. Thus, the question of willfulness is also a common question in this case.

### b. The Adverse Action Subclass

Thomas alleges that Defendants' practices with respect to the Adverse Action subclass were uniform: "none of the consumers in the class definition received a notice of his FCRA rights or a copy of the consumer report prior to suffering an adverse employment action based on the report." (Pl. Mem. at 14). Therefore, Thomas concludes, "whether Defendants' failure to provide the consumer report and summary of rights" before taking adverse action violated § 1681b(b)(3) presents a question

18

common to all subclass members. (Pl. Mem. at 13-14). Defendants do not contest this assertion.

As noted above, the commonality requirement is satisfied if the Court determines that there is one question common to all members of the class such that the question "is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S. Ct. at 2551. In Milbourne, the Court found that the question of whether a defendant's actions violated § 1681b(b)(3)(A) satisfied Rule 23(a)'s commonality requirement. Because the defendant had "indicated that its practices were standardized during the class period...if [its] actions violated Milbourne's § 1681b(b)(3)(A) rights, they also violated other class members' rights as well." Id. at *6.

More recently, in Manuel, faced with claims substantively indistinguishable from the claims in this case, the Court reached the same conclusion. 2015 WL 4994549, at *10-*11. In that case, the Court found that the commonality requirement was satisfied for an Adverse Action Subclass essentially identical to the one proposed by Thomas because a pre-adverse action notice was automatically sent by Wells Fargo after a Wells Fargo employee marked a putative class member as ineligible for employment, and because these procedures were "standard"

19

throughout the class period. <u>Id.</u> Here, Defendants acknowledge that they <u>never</u> sent any pre-adverse action notices to any potential employees during the relevant class period. Therefore, as in <u>Manuel</u> and <u>Milbourne</u>, the question of whether Defendants' actions violated § 1681b(b)(3)(a) satisfies the commonality requirement.

### 4.   Rule 23(a)(3) Typicality

The Fourth Circuit has described the typicality requirement as follows:

> The typicality requirement goes to the heart
> of a representative [party's] ability to
> represent a class, particularly as it tends
> to merge with the commonality and adequacy-
> of-representation requirements. The
> representative party's interest in
> prosecuting [her] own case must
> simultaneously tend to advance the interests
> of the absent class members. For that
> essential reason, plaintiff's claim cannot
> be so different from the claims of absent
> class members that their claims will not be
> advanced by plaintiff's proof of [her] own
> individual claim. That is not to say that
> typicality requires that the plaintiff's
> claim and the claims of class members be
> perfectly identical or perfectly aligned.
> But when the variation in claims strikes at
> the heart of the respective causes of
> actions, we have readily denied class
> certification. In the language of the Rule,
> therefore, the representative party may
> proceed to represent the class only if the
> plaintiff establishes that [her] <u>claims or
> defenses</u> are typical of the <u>claims or
> defenses</u> of the class.

Deiter v. Microsoft Corp., 436 F.3d 461, 466-67 (4th Cir. 2006) (emphasis in original) (internal citations and quotation marks omitted). The class representative "must be part of the class and suffer the same injury as the class members." Falcon, 457 U.S. at 156 (internal quotation marks omitted). Thus, the appropriate analysis of typicality "involves[s] a comparison of the plaintiffs' claims or defenses with those of the absent class members." Dieter, 436 F.3d at 467.

"To conduct that analysis, [the district court] begin[s] with a review of the elements of [the plaintiff's] prima facie case and the facts on which the plaintiff would necessarily rely to prove it." Id. Then, the district court must determine "the extent to which those facts would also prove the claims of the absent class members." Id. In short, "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" Id. at 466 (internal citation omitted).

Thomas argues that, because Defendants used the same Employment Release Form throughout the class period, and because neither Defendants nor BGC ever sent any FCRA-mandated pre-adverse action information to any job applicants, Thomas' claims are clearly typical of the class. (Pl. Mem. at 17). In fact, Thomas alleges that his claims are identical to those of the

remainder of the class, even though this degree of unanimity is not required by the Rule. Id.

Defendants do not contest these assertions. Instead, they argue that Thomas' claims are "singularly" susceptible to the defense that the report procured on Thomas was not a consumer report, because the report "arguably" falls within the "investigations" exemption of 15 U.S.C. § 1681a(y), and therefore Thomas' claims are not typical of the class. (Def. Mem. in Opp. at 13-14). Defendants are remarkably undeterred by the Court's previous rejections of this same argument (ECF Nos. 22, 59) in response to Defendants' Motion to Dismiss (ECF No. 11) and their Motion for Summary Judgment (ECF No. 38). For reasons more fully explained in Part B.1 below, Defendants' reports are clearly consumer reports and uniformly fail to fall within that exemption. Otherwise, Defendants do not argue that Thomas' claims are atypical.

### a. The Impermissible Use Class

Thomas' claims are clearly typical of the Impermissible Use Class because Defendants have admitted that: (1) Unitek obtained a background check on every prospective employee, including Thomas; and (2) Unitek provided every employee with an identical Employment Release Statement. (Def. SJ Mem. Statement of Undisputed Facts ¶¶ 8-16; Conlin Dep. at 58). As was made clear in Manuel,

22

> To establish a violation of § 1681b(b)(2),
> [the plaintiff] must prove that [Defendants]
> did not make an appropriate "clear and
> conspicuous disclosure" as mandated by the
> FCRA prior to conducting its background
> check. As there are no controverted facts
> at issue, the resolution of this question
> will turn on whether the waiver language on
> the disclosure form violated § 1681b(b)(2)'s
> requirements. In order to establish that
> the disclosure form did violate
> § 1681b(b)(2), [the plaintiff] will have to
> establish that legal precedent is such that
> the form violates the FCRA.
>
> All members of the proposed class make
> identical claims under § 1681b(b)(2). They
> all signed identical forms containing the
> same language that would be at issue in the
> case. Because there are no factual
> differences between claims and the members
> all raise the same legal issue as [the named
> plaintiff], there are no factual or legal
> differences between the class members'
> claims and [the named plaintiff's] claim.
> This indicates that [the named plaintiff's]
> "interest in prosecuting his own case
> [would] simultaneously tend to advance the
> interests of the absent class members."
> Deiter, 436 F.3d at 466. Thus, typicality
> is satisfied.

2015 WL 4994549, at *13. The same is true in this case. For

the same reasons stated in Manuel, Thomas' claim satisfies the

typicality requirement for the Impermissible Use Class.

### b. Adverse Action Subclass

Moreover, like every other class member, Thomas did not

receive any pre-adverse action materials from either BGC or

Defendants. Defendants uniformly declined to provide these

materials prior to taking adverse employment action throughout

the class period. Apparently, Defendants were under the impression that BGC had agreed to assume this responsibility. (Conlin Dep. at 104-105; 119). However, BGC's contract with FTS clearly contradicts this statement, and BGC's president has testified that "BGC does not and has never provided that service to its clients." (Pl. Mem. Ex 5 ¶ 3.2; Ex. 6 ¶ 7).

Thus, no individualized inquiry is necessary. Thomas was subjected to the same procedures as all putative class members and it is those procedures that are challenged. Again, the facts and issues presented in this case parallel almost exactly the circumstances found to satisfy typicality in Manuel: "in order to prevail, [Thomas] must establish that this procedure violates § 1681b(b)(3)(A) of the FCRA." Id. Because Unitek's procedures were uniform throughout the class period, the merits of Thomas' claim under § 1681b(b)(3)(A) are identical to those of other class members against whom Unitek took adverse employment action. Hence, the typicality requirement is satisfied for the Adverse Action Class.

### 5. Rule 23(a)(4) Adequacy of Representation

The adequacy of representation prerequisite requires the Court to be satisfied that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This standard is met if "the named plaintiff has interests common with, and not antagonistic to,

24

the [c]lass' interests; and...the plaintiff's attorney is qualified, experienced and generally able to conduct the litigation." In re Se. Hotel Props. Ltd. P'ship Investor Litig., 151 F.R.D. 597, 606-07 (W.D.N.C. 1993). Because the same counsel and named plaintiff seek to represent both classes, the following analysis applies to both the Adverse Action and Impermissible Use Classes.

Taking the second part of the standard first, the Court finds that Thomas' counsel is qualified, experienced, and able to conduct this litigation so as to fully and adequately represent both classes. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases around the country. Defendants do not argue otherwise.

Thomas argues that he adequately represents the proposed classes because he "does not have any interests antagonistic to those of the proposed class and has cooperated with his counsel and pursued this litigation vigorously to redress the wrongs alleged." (Pl. Mem. at 20). Moreover, Thomas seeks "the same findings on the common questions of law and fact" as the absent members of the class. Id.

Defendants argue that Thomas is an inadequate representative for both classes because he has chosen to forego actual damages, and instead seeks only statutory and punitive

25

damages. (Def. Mem. at 15). Defendants claim that Thomas' "open and notorious use of [this] end-around" is particularly unpalatable in light of his individual claims for actual damages in a related lawsuit against BGC. Id. Defendants also add that, because Thomas only seeks statutory damages, he has improperly imposed a cap on the punitive damages that absent class members can receive, because "the size of a constitutionally permissible punitive damage award calculation against individual members' actual damages has the potential significantly to exceed the size of a constitutionally permissible punitive damage award calculated against statutory damages alone." Id. (citing Williams v. Telespectrum, Inc., 2007 WL 6787411, at *6 (E.D. Va. June 1, 2007)).

Defendants' argument has been repeatedly rejected by this and other Courts. As pointed out by Chief Judge Easterbrook of the United States Court of Appeals for the Seventh Circuit, requiring FCRA plaintiffs to seek compensatory damages rather than relying on statutory and punitive damages "would make consumer class actions impossible." Murray v. GMAC Mortg. Corp., 434 F.3d 948, 953 (7th Cir. 2006). Moreover,

> [r]efusing to certify a class because the plaintiff decides not to make the sort of person-specific arguments that render class treatment infeasible would throw away the benefits of consolidated treatment. Unless a district court finds that personal injuries are large in relation to statutory

> damages, a representative plaintiff must be
> allowed to forego claims for compensatory
> damages in order to achieve class
> certification. When a few class members'
> injuries prove to be substantial, they may
> opt out and litigate independently.

Id. at 952-53. The fact that a plaintiff chooses to seek actual

damages on his own behalf, in another count or another lawsuit,

does not create a conflict of interest, and therefore does not

defeat class certification. See, e.g., id.; Osada v. Experian

Info. Sol., Inc., 2012 WL 1050067, at *7 (N.D. Ill. Mar. 28,

2012); Chakejian v. Equifax Info. Servs., LLC, 256 F.R.D. 492,

499-500 (E.D. Pa. 2009)(finding that "[t]he fact that some

members of the putative class might have actual damages is not a

true conflict of interest between the representative and other

class members in this case, where class members with significant

actual damages may opt-out of the class litigation."); In re

Farmers Ins. Co., Inc., FCRA Litigation, 2006 WL 1042450, at *7

(W.D. Okla. Apr. 13, 2006) (same). Moreover, there is no

showing in the record that the election of statutory damages as

a remedy by Thomas would not benefit the majority, if not all,

of the members of the class.

Defendants' repeated citations to Williams v. Telespectrum

are entirely unavailing. In that case, the plaintiffs had

proposed to try statutory and punitive damages as class claims,

and to try actual damages as individual claims. As this Court

noted in a later case brought by plaintiff Williams, rejecting an argument essentially identical to Defendants' in this case,

> individual punitive damage issues predominated [in Telespectrum] because the plaintiffs' alleged actual damages, which had to be tried individually, were much larger than statutory damages, and thus would permit for larger punitive damage awards if each class member tried their claims individually than if the claims were tried on a class-wide basis, where they would be measured for due process concerns against statutory damages only.

Williams v. LexisNexis Risk Mgmt., Inc., 2007 WL 2439463, at *5 (E.D. Va. Aug. 23, 2007). Here, as in Williams v. LexisNexis, Thomas does not seek actual damages at all, and the Telespectrum decision is inapplicable to this case.

For the foregoing reasons, the Court finds that Thomas has no conflict of interest with absent class members and that he is an adequate representative for both classes.

## B.  Rule 23(b)(3)

In order to be certified as a class action, the class must satisfy at least one of the class categories defined in Rule 23(b).  Thomas here moves for certification under Rule 23(b)(3). Certification under Rule 23(b)(3) is appropriate where the Court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy.

### 1. Predominance

Under Rule 23(b)(3), the common questions found under Rule 23(a)(2) "must predominate over any questions affecting only individual members." Amchem Prods., Inc. v. Windsor, 521 U.S. at 615. Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." Ealy v. Pinkerton Gov't Servs., 514 F. App'x 299, 305 (4th Cir. 2013) (citing Dukes, 131 S. Ct. at 2556). This requirement is "even more demanding than Rule 23(a)," Comcast, 133 S. Ct. at 1432, and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," Amchem, 521 U.S. at 623. This is not simply a matter of counting common versus noncommon questions and checking the final tally. "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." Stillmock v. Weis Markets, Inc., 385 F. App'x 267, 272 (4th Cir. 2010) (citing Gunnells v. Healthplan Servs., 348 F.3d 417, 429 (4th Cir. 2003)). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." Newberg § 3:27.

If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to

resolve individualized issues. See Ealy, 514 F. App'x at 305 ("Indeed, common issues of liability may still predominate even when some individualized inquiry is required."). For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." Stillmock, 385 F. App'x at 273 (citing Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003)). This is because class certification in such cases will still "achieve economies of time, effort, and expense, and promote...uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Gunnells, 348 F.3d at 424 (citing Amchem, 521 U.S. at 615); see also id. at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues. Consolidation of these recurring common issues will also conserve important judicial resources.").

Thomas argues that the dominant issues in this case are whether Defendants are liable for: "(1) impermissibly obtaining class members' consumer reports based on the failure to provide a lawful disclosure or obtain authorization," from the

30

Impermissible Use Class, and (2) for the complete failure to provide a copy of the consumer report and FCRA summary of rights before taking adverse employment action against the Adverse Action Subclass. (Pl. Mem. at 22). Moreover, all members of the Impermissible Use Class and the Adverse Action Subclass "share an identical set of relevant facts and legal theories for the FCRA violations in the Complaint, will have to obtain the same evidence, prove the same elements, prove willfulness, and rebuff the same defenses." Id. at 22-23.

In response, Defendants make two arguments. (Defendants appear to be opposing the certification of both the Impermissible Use Class and the Adverse Action Subclass on the same two grounds.) First, Defendants argue that the predominance requirement is not satisfied because the question whether the background checks Defendants procured from BGC fall within the § 1681a(y) "investigation" exemption to the FCRA's definition of "consumer reports"[1] will require "individualized mini-trials." (Def. Mem. at 22-23). Therefore, although Defendants do not dispute that the questions posed by Thomas are

---

[1] A "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for…employment purposes." 15 U.S.C. § 1681a(d).

common to the class, Defendants conclude that "necessary member-by-member inquiries as to the applicability of Defendants' threshold Section 1681a(y) defense nonetheless predominate over any commonality as to Defendants' liability to individual class members." Id. at 21. Second, Defendants argue that the variance among individual putative class members' amounts of statutory damages also weighs against class certification.

Section 1681a(y) excludes certain reports from the FCRA definition of a consumer report and reads as follows:

> **1) Communications described in this subsection.—** A communication is described in this subsection if—
>
> **(A)** but for subsection (d)(2)(D) of this section, the communication would be a consumer report;
>
> **(B)** the communication is made to an employer in connection with an investigation of—
>
> (i)     suspected misconduct relating to employment; or
>
> (ii)    compliance with Federal, State, or local laws and regulations, the rules of a self-regulatory organization, or any preexisting written policies of the employer;
>
> **(C)** the communication is not made for the purpose of investigating a consumer's credit worthiness, credit standing, or credit capacity; and
>
> **(D)** the communication is not provided to any person except—

32

    (i)      to the employer or an agent of the employer;

    (ii)    to any Federal or State officer, agency, or department, or any officer, agency, or department of a unit of general local government;

    (iii)   to any self-regulatory organization with regulatory authority over the activities of the employer or employee;

    (iv)    as otherwise required by law; or

    (v)     pursuant to section 1681f of this title.

The Court interpreted this subsection recently in Manuel, and rejected an argument that was essentially identical to Defendants' argument here, adopting the reasoning of a California district court interpreting the same statutory provision in Newton v. Bank of Am., N.A., 2015 U.S. Dist. LEXIS 62930 (C.D. Cal. 2015). In Newton, the court analyzed the text of § 1681a(y) and concluded that the "text of the Exclusion is limited by the term 'investigation'...[which] is interpreted according to its ordinary meaning." Id. at *12. The court then held that the defendant's practice of requiring all applicants to undergo a background check was "not an 'investigation' within the plain language of the Exclusion" because said background checks were conducted pursuant to a written policy establishing

a background check as a mandatory condition for employment, rather than an "investigation," which it defined as "a systematic or official inquiry into [Defendant's] compliance with federal laws and written policies." Id. at *12-14.

The Fourth Circuit has also spoken on the definition of "investigation" in connection with a separate provision of the FCRA. In Johnson v. MBNA Am. Bank, N.A., the Fourth Circuit held that, because "investigation...is defined as 'a detailed inquiry or systematic examination'...the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors."[2] 357 F.3d 426, 430 (4th Cir. 2004).

In Manuel, the Court began by noting that "[i]t is clear from the plain language of § 1681a(y) that a background check must be procured 'in connection with an investigation' in order to fall within the statute's exception. More particularly, the background check itself cannot be the investigation, but must rather be part of a larger inquiry." 2015 WL 4994538, at *14. The Court went on to hold that Wells Fargo's background check process did not fall within the definition of an "investigation" as required by this subsection because

---

[2] The statutory language at issue in Johnson stated that "[a]fter receiving notice...of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall...conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1)(A).

> the only inquiry in which Wells Fargo
> engages respecting whether an individual
> qualifies for employment under the banking
> regulations involves requesting the actual
> background check from First Advantage and
> looking at that background check. There is
> no greater 'careful inquiry' into the
> individual's criminal history that would
> qualify the process as an 'investigation'
> under § 1681a(y).

Id. at *15. Furthermore, the Court found it irrelevant that Wells Fargo obtained background checks in order to ensure its compliance with federal laws, because under this view, "no employer would have to comply with the FCRA as long as some part of the background checking process helped them to comply with a federal law." Id. The two other district courts that have recently addressed identical arguments have reached this same conclusion: a routine pre-employment background check is not an "investigation" within the meaning of the FCRA, even if the background check helps an employer ensure compliance with federal law, state law, or written internal policies. See Ramos v. Genesis Healthcare, LLC, 2015 WL 5822635, at *4 (E.D. Pa. Oct. 1, 2015); Freckleton v. Target Corp., 81 F. Supp. 3d 473 (D. Md. 2015).

Defendants attempt to distinguish this case from the essentially identical facts in Manuel by pointing out that in Manuel, Wells Fargo attempted to apply this defense categorically, arguing that every report it procured was an

"investigation," whereas here, Defendants "do not suggest that their procurement of each and every background check definitively amounts to an 'investigation' within the scope of Section 1681a(y), they maintain only that such a determination would need to be made on a member-by-member basis." (Def. Mem. in Opp. at 23). Defendants are careful to mention that not only did they "assess" Thomas' driving history, but after realizing that the initial report received from BGC was inaccurate, "Defendants ordered a second, enhanced report from BGC based on a closer, more involved analysis of Plaintiff's background." Id. at 24. Therefore, Defendants conclude, their "investigation encompassed research, synthesis, and evaluation of Plaintiff's background information - a more 'careful inquiry' than requesting his background check and, thereafter, simply looking at that background check." Id. at 25.

However, Defendants' attempts to distinguish this case from Manuel fall completely flat, despite the liberal use of the word "investigation" throughout this section of their brief. Indeed, as noted above, the Court has already rejected this argument twice during the course of this litigation. The fact that Defendants made efforts to ascertain the accuracy of Thomas' report, and then "analyzed" that report by comparing the entries therein against the requirements of their internal policies, is entirely unremarkable. These are routine and necessary steps in

36

any background screening process. Defendants' argument conveniently overlooks the Court's holding that "the background check itself cannot be the investigation, but must rather be part of a larger inquiry," and also flies directly in the face of the unanimous authority cited above. Manuel, 2015 WL 4994538, at *14 (emphasis added).

Moreover, as Plaintiffs point out, the argument that such steps would necessitate "individualized inquiry" is completely contradicted by Defendants' own admissions that the process is entirely uniform:

> FTS requires a background check as to every prospective employee whether or not FTS has a specific or particular suspicion of misconduct by that person. Doc. No. 38 at 7, ¶ 8. FTS requires that all prospective employees meet the criteria set forth in its Background & MVR Criteria for Employment to be eligible for a position. Id. at 7, ¶ 9. Generally speaking, "[a]ll potential employees for UNITEK Global Services or any of its operating companies must pass pre-employment criminal background and drug screens as allowed by state and federal law...

(Def. Mem. in Opp. at 3). As noted above, the fact that Defendants may in some cases order a follow-up report, confer among each other concerning the report's contents, or compare the report against their company-wide hiring criteria by no means transforms this entirely routine and unremarkable process into a "larger inquiry." To the contrary, the background checks

37

procured by Defendants are a quintessential example of a "consumer report" procured for "employment purposes." Indeed, Defendants' argument evinces a fundamental misunderstanding of the Court's use of the phrase "larger inquiry" in Manuel: by definition, such a "larger inquiry" into company-wide compliance is not "individualized" in the sense that Defendants attempt to apply that term.

Finally, Defendants' argument that individualized statutory damages preclude a finding of predominance ignores the rather settled principle that "the question of statutory damages may be individualized but is minimally influential in the predominance analysis." Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 216 (E.D. Va. 2015); see also Manuel, 2015 WL 4994549, at *17. Indeed, Defendants seem to recognize the futility of this argument, acknowledging that this issue "may not alone defeat certification," but it "nonetheless further compounds" the other issues raised in Defendants' briefs. (Def. Mem. in Opp. at 27). However, none of these other issues pose any significant obstacles to Thomas' proposed classes, for the reasons above, and thus, this half-hearted effort completely fails to damage Plaintiffs' case for certification.

### a. The Impermissible Use Class

The Fourth Circuit has held that, "where...the qualitatively overarching issue by far is the liability issue of

the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner," predominance is satisfied. Stillmock, 385 F. App'x at 273; see also Dreher v. Experian Info. Sol., Inc., 2014 U.S. Dist. LEXIS 85951, at *6 (E.D. Va. June 19, 2014) ("The question of [Defendant's] liability represents the central, dominant issue before the Court, and while some questions may exist as to how to best apportion statutory damages, those questions do not preclude the common issue of liability from predominating."). Further, "common issues of law and fact predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." Stillmock, 385 F. App'x at 273 (internal quotation marks omitted).

As explained above, each class member's case is based on the same FCRA disclosure form. Thus, "the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner." Id. Therefore, the resolution of whether the release form complied with § 1681b(b)(2) will have "a direct impact on every class member's effort to establish liability." Id. The Court therefore finds that predominance is satisfied for the Impermissible Use Class.

39

### b. Adverse Action Subclass

Thomas argues that the dominant question for the Adverse Action Subclass is whether Defendants' uniform failure to provide potential employees with copies of their background checks or FCRA rights prior to taking adverse employment action violated the FCRA. Defendants' generalized arguments concerning predominance also fail with respect to the Adverse Action Subclass, for the reasons discussed above.

There is no individualized inquiry necessary to ascertain whether the reports procured by Defendants concerning the members of the Adverse Action Subclass constituted "investigations" within the meaning of § 1681a(y), because the reports were clearly consumer reports, for the reasons above. Defendants acknowledge that they never provided pre-adverse action notices to any class members, so there is no individualized inquiry necessary to determine whether a class member received FCRA disclosures. Moreover, Defendants have admitted that they had standardized hiring procedures and criteria during the class period, and Thomas is challenging only those standardized procedures. Again, "the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner." Stillmock, 385 F. App'x at 273. "The question of Defendant's liability represents the central, dominant issue before the

40

Court, and while some questions may exist as to how best to apportion statutory damages, those questions do not preclude the common issue of liability from predominating." Dreher, 2014 U.S. Dist. LEXIS 85951, at *6. For the foregoing reasons, the Adverse Action Subclass satisfies the predominance requirement.

## 2. Superiority

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" and "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved.'" Stillmock, 385 F. App'x at 274 (quoting 7A Wright, Miller & Kane, supra, § 1779). When making a "determination of whether the class action device is superior to other methods available to the court for a fair and efficient adjudication of the controversy...[the court should] not contemplate the possibility that no action at all might be superior to a class action." Brown v. Cameron-Brown Co., 92 F.R.D. 32, 49 (E.D. Va. 1981). In determining whether the class action mechanism is truly superior, the court should consider "the class members' interest in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class

41

members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(e)(A)-(D).

Thomas argues that a class action is superior in this case to other methods available for adjudication. (Pl. Mem. at 27). He argues that it would waste judicial and individual resources to have hundreds of trials, that individual plaintiffs are not likely to understand the FCRA and that they might have a case under it, that individual plaintiffs are unlikely to bring a lawsuit under the FCRA because of the marginal statutory damages, and that litigation under the class action framework is effectively the only way that private individuals can enforce the FCRA. Id. at 25-28. Defendants do not argue that superiority is not satisfied.

The potential class members' claims for statutory damages are small when considered in comparison to the effort it would take to assert them in court. The FCRA allows statutory damages up to $1,000 and, in the case of a willful violation, punitive damages which are limited by the due process clause of the Constitution. A successful plaintiff can also receive attorneys' fees and court costs. In comparison, initiating an action in federal court requires the plaintiff's time and effort, an attorney's willingness to take the case, and the

42

plaintiff's acceptance of the possibility that he could be forced to pay attorneys' fees if he does not prevail. Additionally, as Thomas points out, many plaintiffs will not be aware that their rights were violated because of the technical nature of the FCRA and thus would not be able to bring a suit at all.

In addition to ensuring a full and fair adjudication of all members' cases, the class action is a superior method in this case for several practical reasons. First, it serves the interest of judicial economy. It saves time and resources to resolve the issues presented on a class-wide basis rather than to conduct several hundred individual trials on the same issues. Second, the factors listed in Rule 23 weigh in favor of a class action's superiority. First, the interest in personal control of the litigation is minimal in this context. See, e.g., Soutter, 307 F.R.D. at 218. To the extent any individual does wish to retain control, or seek actual damages, the opt-out mechanism will be available. Second, there is no other related litigation pending that bears on this analysis. Third, because potential class members are spread over the entirety of the United States, it would be very desirable to hear the case in one forum and thus allow for a more efficient, consolidated resolution of the common issues. Finally, the similarity of factual and legal issues indicates that a class action would be

manageable from the parties' and court's perspective. Thus, the class action appears to be the superior method of pursuing the FCRA claims in this case.

**CONCLUSION**

For the reasons set forth above, Plaintiff's MOTION FOR CLASS CERTIFICATION (ECF No. 91) will be granted in part and denied in part. The Impermissible Use Class will be defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendants or any of their subsidiaries within the two years immediately preceding the filing of the Complaint in this matter on December 11, 2013, and as part of this application process were the subject of a consumer report obtained by Defendants, (a) where the defendants failed to provide a written disclosure as stated at 15 U.S.C. § 1681b(b)(2)(A)(i) to the applicant that they intended to obtain a consumer report for employment purposes, (b) and where as a result the Defendants failed to obtain a proper written authorization as stated at 15 U.S.C. § 1681b(b)(2)(A)(ii) signed by the applicant prior to obtaining the consumer report.

The Adverse Action Subclass will be defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendants or any of their subsidiaries within the two years immediately preceding the filing of the

44

Complaint in this matter on December 11, 2013, and as part of this application process were the subject of a consumer report obtained by Defendants, (a) where the defendants failed to provide a written disclosure as stated at 15 U.S.C. § 1681b(b)(2)(A)(i) to the applicant that they intended to obtain a consumer report for employment purposes, (b) and where as a result the Defendants failed to obtain a proper written authorization as stated at 15 U.S.C. § 1681b(b)(2)(A)(ii) signed by the applicant prior to obtaining the consumer report, and (c) whom Defendants found ineligible for the position for which the applicant had applied based on the applicant's consumer report; (d) to whom Defendants did not provide a copy of the consumer report as stated at 15 U.S.C. § 1681b(b)(3)(A)(i) at least five business days before the date the adverse employment decision is first noted in Defendants' records, (d) and to whom Defendants did not provide a written summary of Fair Credit Reporting Act rights as stated at 15 U.S.C. § 1681b(b)(3)(A)(ii) at least five business days before the date the adverse employment decision is first noted in Defendant's records.

It is so ORDERED.

_____ /s/  _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: January _7_, 2016