IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



KELVIN M. THOMAS, et al.,

        Plaintiffs,

v.                         Civil Case No. 3:13-cv-825

FTS USA, LLC, et al.,

        Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (ECF No. 156). For the reasons set forth herein, the motion will be denied.

### BACKGROUND

On December 11, 2013, Plaintiff Kelvin Thomas ("Thomas") filed a class action complaint on behalf of himself and all others similarly situated, alleging that defendant FTS USA, LLC ("FTS"), a subsidiary of UniTek Global Services, Inc. (("UniTek"); collectively, "Defendants") had violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"). (Complaint ("Compl.") (ECF No. 1)). Counts One and Two of the Complaint allege violations of 15 U.S.C. § 1681b(b)(2)(A)(i) and (ii), which require a disclosure and written consent from the

1

consumer before a person may obtain a consumer report[1] for employment purposes. Counts Three and Four allege violations of 15 U.S.C. §§ 1681b(b)(3)(A)(i) and (ii), respectively. In sum, that subsection states that an employer may not take adverse employment action based on a consumer report before the affected person receives a copy of the consumer report and a summary of rights under the FCRA. Both subsections will be discussed in more detail below.

On January 7, 2016, the Court granted Thomas' motion to certify two classes based on the allegations in the Complaint. (ECF No. 105). The Court first certified a so-called "Impermissible Use Class," defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendants or any of their subsidiaries within the two years immediately preceding the filing of the

---

[1] The FCRA defines a "consumer report" as:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used in whole or in part for the purposes of serving as a factor in establishing the consumer's eligibility for:...employment purposes[.]

15 U.S.C. § 1681a(d).

2

> Complaint in this matter on December 11,
> 2013, and as part of this application
> process were the subject of a consumer
> report obtained by Defendants, (a) where the
> defendants failed to provide a written
> disclosure as stated at 15 U.S.C. §
> 1681b(b)(2)(A)(i) to the applicant that they
> intended to obtain a consumer report for
> employment purposes, (b) and where as a
> result the Defendants failed to obtain a
> proper written authorization as stated at 15
> U.S.C. § 1681b(b)(2)(A)(ii) signed by the
> applicant prior to obtaining the consumer
> report.

(ECF No. 105).

The Court also certified an "Adverse Action Sub-Class,"
defined as follows:

> All natural persons residing in the United
> States (including all territories and other
> political subdivisions of the United
> States), who applied for an employment
> position with Defendants or any of their
> subsidiaries within the two years
> immediately preceding the filing of the
> Complaint in this matter on December 11,
> 2013, and as part of this application
> process were the subject of a consumer
> report obtained by Defendants, (a) where the
> defendants failed to provide a written
> disclosure as stated at 15 U.S.C. §
> 1681b(b)(2)(A)(i) to the applicant that they
> intended to obtain a consumer report for
> employment purposes, (b) and where as a
> result the Defendants failed to obtain a
> proper written authorization as stated at 15
> U.S.C. § 1681b(b)(2)(A)(ii) signed by the
> applicant prior to obtaining the consumer
> report, and (c) whom Defendants found
> ineligible for the position for which the
> applicant had applied based on the
> applicant's consumer report; (d) to whom
> Defendants did not provide a copy of the
> consumer report as stated at 15 U.S.C. §

> 1681b(b)(3)(A)(i) at least five business
> days before the date the adverse employment
> decision is first noted in Defendants'
> records, (d) and to whom Defendants did not
> provide a written summary of Fair Credit
> Reporting Act rights as stated at 15 U.S.C.
> § 1681b(b)(3)(A)(ii) at least five business
> days before the date the adverse employment
> decision is first noted in Defendant's
> records.

Id.

After the Court certified the classes, the parties conducted limited post-certification discovery. The Court granted leave for Defendants to file a second motion for summary judgment "limited to the following two issues: a. Class Representative Kelvin Thomas' understanding of the Employment Release Form that he signed at the time he applied for employment with FTS USA, LLC; and b. Plaintiffs' damages." (ECF No. 124).

After the close of discovery, Defendants filed their second motion for summary judgment. (ECF No. 156). Defendants now contend that summary judgment is appropriate because: (1) Defendants' disclosure forms comply with 15 U.S.C. § 1681b(b)(2); (2) Plaintiffs lack standing under the Supreme Court's decision in Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016); (3) summary judgment is proper as to some members of the Adverse Action Sub-Class who received notice as required by 15 U.S.C. § 1681b(b)(3); (4) summary judgment is proper as to some

4

members of the class who executed general releases or signed
settlement agreements such that their claims are barred by the
doctrine of accord and satisfaction; and (5) Thomas is barred
from pursuing the instant claims by judicial estoppel.
(Memorandum of Law in Support of Defendants' Motion for Summary
Judgment ("Def. Mem.," ECF No. 157)).

Defendants' motion obviously is not confined to the scope
allowed by the order authorizing a second motion for summary
judgment.  (ECF No. 124).  Nonetheless, it is appropriate for
Defendants to raise, and for the Court to address, the standing
issue, because that is a question of subject matter
jurisdiction.  Defendants have abandoned the defenses of release
and accord and satisfaction; therefore, that part of the summary
judgment motion will not be further addressed. See ECF No. 217.
For reasons set forth in the Memorandum Opinion (ECF No. 217)
addressing PLAINTIFF'S OBJECTION AND MOTION TO STRIKE (ECF No.
173), the Court has stricken the evidentiary support for the
newly minted argument that some members of the Adverse Action
Sub-Class received proper pre-adverse action notices.  Hence,
Defendants' motion for summary judgment against those class
members will be denied.  As to Defendants' argument respecting
the adequacy of the Employment Release Statement (which is
beyond the scope allowed by the Court's order, ECF No. 124), the
motion will be denied because Plaintiffs are entitled to summary

judgment on that issue, as set forth in a separate Memorandum Opinion and order.  Finally, the motion for summary judgment on the ground of judicial estoppel will be denied.

## A. Factual Background

In September 2009, Thomas obtained a job with Cableview Communications ("Cableview"), which was purchased by FTS in the fall of 2011.  (Deposition of Kelvin Thomas ("Thomas Dep.," ECF No. 165-2) at 12).  Defendant UniTek is the parent company of FTS.  (ECF No. 38 at 6, ¶ 2).  In order to continue his employment with FTS, on January 17, 2012, Thomas signed an "Employment Release Statement," which provides, in pertinent part:

> Prior to and for the duration of my employment with FTS USA, LLC (the "Company"), I understand that investigative background inquiries are going to be made on myself [sic].  I understand that the Company will be requesting information from various Federal, State, Local and other agencies which maintain records concerning my past activities relating to my driving history, credit, criminal, civil, and other experiences.  These reports may also include inquiries regarding my educational history and past work experience and performance including reasons for termination of employment.
>
> I authorize, without reservation, any party or agency contacted by the Company or its agents to furnish any of the above mentioned information or any other information requested.

(ECF No. 92 Ex. 1).   According to Steven Conlin, Defendants' corporate designee under Fed. R. Civ. P. 30(b)(6), the Employment Release Statement that Thomas received was UniTek's standard disclosure form, which was provided to all prospective employees during the relevant class period.   (Deposition of Steven Conlin ("Conlin Dep.," ECF No. 165-1) at 58).

After its acquisition of Cableview, FTS required every Cableview employee who wished to continue employment with FTS to undergo a background check.   (ECF No. 38 at 3, ¶¶ 7-10). UniTek's internal hiring policies provided that "[a] pending employee may not be eligible for hire" if the employee has been charged with or convicted of certain felonies, misdemeanors, driving offenses, or other "unacceptable" crimes.   Id. at ¶¶ 11-12.

On or about January 20, 2012, UniTek, which performed "all consumer report-related functions on behalf of itself and...FTS," ordered a background check on Thomas from Backgroundchecks.com ("BGC"), a consumer reporting agency.   (ECF No. 99, Ex. D).   BGC performed all background checks for consumers who applied for employment with FTS, but UniTek also engaged various other consumer reporting agencies to perform background checks on its other subsidiaries' potential employees.   (Conlin Dep. at 73).

7

BGC's initial report on Thomas contained numerous felony convictions, including convictions for distribution of marijuana, money laundering, statutory rape, and carnal knowledge of a juvenile, all of which were incorrectly attributed to Thomas. (ECF No. 38, Ex. C). The report also revealed that Thomas' driving record contained several moving violations, as well as a report of a 2011 accident in which Thomas was at fault. Id. Thomas was not afforded an opportunity to review or address the contents of that report.

On March 12, 2012, Thomas' supervisor informed Thomas that, as a result of his driving record, he was ineligible for the position for which he had applied. (ECF No. 38, Exs. E, F; Conlin Dep. at 136). On that same date, an FTS representative provided Thomas with an edited copy of the BGC background check, which included some of the erroneous convictions. (Thomas Dep. at 21). Thomas then informed Defendants that his background check was inaccurate. Id. Thereafter, BGC provided an updated background check that reflected no criminal charges, but confirmed that Thomas' driving record was accurate. (ECF No. 38, Ex. D).

It is undisputed that Thomas was never given a copy of the background check before March 12, 2012, and Defendants did not ever provide Thomas with a summary of his rights under the FCRA. In fact, Defendants never provided either of these documents to

any current or potential employees because, according to Defendants, they were under the impression that their third-party vendors would provide the required notices. (Conlin Dep. at 121-122). Defendants claim to have held that belief notwithstanding the absence of any provisions to that effect in the contracts between Defendants and their background check vendors. (ECF Nos. 165-9, 165-11).

## DISCUSSION

### A. Legal Standard

Summary judgment is proper when there is no genuine issue as to any material fact in the case such that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Once the moving party properly files and supports its motion for summary judgment, the opposing party must show that a genuine issue of fact exists. See Matsushita Elec. Indus. Co v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

A fact is material if the existence or non-existence thereof could lead a jury to different resolutions of the case. See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). A genuine issue of material fact only exists when the opposing party has presented sufficient evidence upon which a reasonable jury could return a verdict in its favor. Id. This means that "summary judgment is only appropriate when, after discovery, the non-moving party has failed to make a 'showing sufficient to

9

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" BM v. Chesterfield County School Dist., 2010 WL 145661, at *1 (E.D. Va. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). In considering motions for summary judgment, the court must consider the evidence in the light most favorable to the non-moving party. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1985).

### B. The Standing Issue

As a threshold matter, Defendants contend that Thomas and the other class members lack standing to pursue their claims because they have failed to allege a cognizable injury-in-fact, as defined in the Supreme Court's recent decision in Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016). (Def. Mem. at 21-24).[2] Defendants take the view that Spokeo significantly heightened the threshold of constitutional standing and that "the Plaintiffs' alleged injuries are **exactly** what the Supreme Court stated **would not** constitute a concrete injury [in Spokeo], i.e., a technical procedural violation that causes no concrete harm." Id. at 23-24 (emphasis in original). In support of that argument, Defendants point to Thomas' testimony that he is

---

[2] Defendants' standing argument appears near the end of their summary judgment brief; however, because standing is a jurisdictional question and jurisdiction must be established before the merits of a case may be considered, the Court addresses the issue of standing first.

seeking only statutory damages and that he has declined to seek any actual damages. Id. at 24.

Thomas responds that Spokeo did not alter the constitutional requirements for standing. (Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment ("Pl. Mem. in Opp.," ECF No. 176) at 12-13). In any event, Thomas argues that every class member has suffered two concrete injuries. First, Thomas contends that, because Defendants procured class members' consumer reports without obtaining proper authorization as required by statute, Defendants have unlawfully invaded the class members' rights of privacy created by the FCRA. Id. at 15. Second, Thomas asserts that he and the class have suffered an "informational injury," because Defendants "denied Mr. Thomas information to which she [sic] was specifically entitled under the FCRA." Id. at 17.

### a. Legal Framework

Contrary to Defendants' position, Spokeo did not change the basic requirements of standing. Indeed, the Supreme Court reaffirmed that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S. Ct. at 1547 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). As the party invoking federal jurisdiction, Thomas

bears the burden of establishing those elements. Lujan, 504 U.S. at 560.

It is undisputed that the alleged statutory violations are traceable to Defendants' conduct, and that the alleged violations are redressable by statutory damages. Accordingly, the remainder of the discussion on the standing issue is addressed solely to the requirement of injury-in-fact.

In Spokeo, the Court reiterated that to satisfy the first element of the Lujan test, a plaintiff must establish that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). To be "particularized," an injury "'must affect the plaintiff in a personal and individual way,'" Spokeo, 136 S. Ct. at 1548 (citing Lujan, 504 U.S. at 560 n.1), as opposed to an "undifferentiated, generalized grievance" that all citizens share. Lance v. Coffman, 549 U.S. 437, 442 (2007). However, "the fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance," as long as "each individual suffers a particularized harm." Spokeo, 136 S. Ct. at 1548 n.7.

A "concrete" injury, on the other hand, is one that is "'real,' and not 'abstract.'" Spokeo, 136 S. Ct. at 1548

12

(citing Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)). Tangible injuries plainly satisfy this requirement, but intangible injuries may also "nevertheless be concrete." Id. at 1549. In evaluating whether an intangible injury satisfies the "concreteness" requirement, the Spokeo Court offered two important considerations: (1) "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts[;]" and (2) the judgment of Congress, which "'has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" Id. (quoting Lujan, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in judgment)).

The Supreme Court then elaborated on the connection between statutory standing created by Congress and concrete injury. To begin, the Court explained that, "Article III standing requires a concrete injury even in the context of a statutory violation," and therefore "[the plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. (citing Summers v. Earth Island Institute, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation...is

13

insufficient to create Article III standing")). Attempting to clarify that distinction, the Court then noted that, although one of the FCRA's purposes is to protect against inaccurate credit reporting, "not all inaccuracies cause harm or present any risk of harm": for example, "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." Id. at 1550.

At the same time, the Court observed that, in cases where "harms may be difficult to prove or measure[,]" "the violation of a procedural right granted by statute can be sufficient...[and] a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." Id. at 1549 (citing Federal Election Comm'n v. Akins, 524 U.S. 11, 20-25 (1998); Public Citizen v. Department of Justice, 491 U.S. 440, 449 (1989)) (emphasis in original). As one commentator has put it:

> In these situations, legal rights reflect social judgments about where harm has and has not occurred. Often, these kinds of injuries exist where we think the harm is in the act itself. The public disclosure of private information or defamatory falsehoods does not need downstream consequences to be hurtful; neither does differential treatment on the basis of race. Procedural wrongs are an oft-seen category where the distinction between the legal violation and the injury may be so thin as to be essentially nonexistent. Proving the injury in many of these cases just entails proving the violation itself—that certain words were

14

> spoken, certain information disclosed, or
> certain procedures flouted. As a result,
> requiring some sort of additional indicia of
> harm beyond the violation itself ignores the
> nature of the injury and the reason for the
> remedy.

Daniel Townsend, Who Should Define Injuries For Article III Standing?, 68 STAN L. REV. ONLINE 76, 80-81 (2015).

In sum, then, the proposition that "[t]he...injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'" survives Spokeo subject to qualification, depending on the facts of each case and the considerations articulated above, but nevertheless intact. Warth v. Seldin, 422 U.S. 490, 500 (1975) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973)). These fundamental principles guide the analysis of the standing questions raised in Defendants' motion. With those principles in mind, it is necessary, as Spokeo instructs, to look to the common law and to the judgment of Congress, as reflected in the FCRA, to determine whether the violations of that statute alleged by Thomas constitute concrete injuries that satisfy the case or controversy requirement.

### b. Statutory Text

A fundamental premise of Defendants' motion is that, in all four counts of the Complaint, Thomas is asserting technical or procedural violations of the FCRA. The assumed predicate of

15

that argument is that sections §§ 1681b(b)(2) and 1681b(b)(3) do not create substantive rights, the violation of which can cause a concrete injury as defined in Spokeo.

The first task, then, is to determine from the statutory text the nature of the substantive protections that Congress intended to create in enacting those sections of the FCRA. The text at issue is found in two separate but related subsections of the FCRA that were added to the statute in 1994: 15 U.S.C. §§ 1681b(b)(2) and 1681b(b)(3). H.R. Rep. No. 103-486, 103d Cong., 2d Sess. (1994). The words of the statute are accorded their ordinary meaning in the absence of a statutory definition. Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1706-07 (2012) (citing FCC v. AT&T Inc., 131 S. Ct. 1177, 1182 (2011)).

Section 1681b(b)(2)(A) provides that:

> a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless: (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

That subsection protects against securing a consumer's private information that by way of a consumer report except on certain

16

conditions.   The first condition is that a person seeking to obtain a consumer report for employment purposes must, before doing so, provide the consumer with a clear and conspicuous disclosure that the report will be obtained.   The second is that the person seeking to obtain the report must first obtain the consumer's written consent.

Thus, § 1681b(b)(2) establishes two rights.   First, it establishes a right to specific information in the form of a clear and conspicuous disclosure.   The statutory requirement that the disclosure be made in "a document that consists solely of the disclosure" helps to implement the textual command that the disclosure be clear and conspicuous.   Second, § 1681b(b)(2) establishes a right to privacy in one's consumer report that employers may invade only under stringently defined circumstances.   Those protections are clearly substantive, and neither technical nor procedural.

Section 1681b(b)(3) provides that:

> In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates: (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as presented by the Bureau under Section 1681g(c)(3) of this title.

17

That subsection protects the consumer against adverse employment actions based on a consumer report that the consumer has had no opportunity to review or discuss with his or her current or prospective employer. Thus, the text of section 1681b(b)(3) provides a consumer with a right to certain information (the consumer report and a description of rights conferred by the FCRA) before an employer takes adverse action based on that report. By requiring that the consumer receive the foregoing information <u>before</u> adverse action is taken, the statute provides the consumer with a right to review the report and discuss it with his putative or current employer before adverse action is taken against him. H.R. Rep. No. 103-486, 103d Cong., 2d Sess. 30-31 (1994). In sum, § 1681b(b)(3) also delineates substantive rights.

Moreover, Congress permitted consumers to sue to redress a breach of the substantive rights set forth in the foregoing subsections and, if successful, to be awarded actual, statutory, and punitive damages, as applicable. 15 U.S.C. § 1681n. In so doing, as set forth in further detail below, Congress defined injuries and articulated chains of causation that give rise to a case or controversy.

### c. Historical Framework: The FCRA

The legislative history of the FCRA underscores the nature and importance of the rights created by the statutory text. To

begin, as our Court of Appeals has held, "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 414 (4th Cir. 2001). Specifically, Congress intended to address developments in "computer technology [that] facilitated the storage and interchange of information" and "open[ed] the possibility of a nationwide data bank covering every citizen." S. Rep. No. 517, 91st Cong., 1st Sess. 2 ("Senate Report"). As Representative Sullivan remarked, "with the trend toward...the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable." 116 Cong. Rec. 36570 (1970).

With the advent of these "computerized data banks," Congress "found that in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment." Dalton, 257 F.3d at 414. Therefore, Congress sought "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information," and "to prevent an undue invasion of the individual's right of privacy in the collection and

19

dissemination of credit information." Senate Report at 1 (emphasis added).

Congress also specifically recognized that "[o]ne problem which the hearings [concerning the bill that later became the FCRA]...identified is the inability at times of the consumer to know he is being damaged by an adverse credit report." Senate Report at 3. "Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story." Id. Congress emphasized that "the consumer has a right to know when he is being turned down for credit, insurance, or employment because of adverse information in a credit report and to correct any erroneous information in his credit file." Id. at 2 (emphasis added). Therefore, Congress wished to "establish[] the right of a consumer to be informed of investigations into his personal life" and to "be told the name of the agency making the report" whenever the individual "is rejected for credit, insurance or employment because of an adverse credit report[.]" Id. at 1 (emphasis added).

Congress added §§ 1681b(b)(2) and (b)(b)(3) in 1994 to advance those objectives. The House Committee stated that those provisions:

prohibit a person from procuring a consumer report on a consumer for employment purposes unless it has been clearly and conspicuously disclosed to the consumer that the report may be obtained for such purposes and the consumer affirmatively consents, in writing, to the procurement of the consumer report. The disclosure must be made in writing in a document that consists solely of the disclosure. Consequently, an employer could not make the disclosure in either a job application or an employee manual...

The bill also triggers special provisions when an employer contemplates taking adverse action based in whole or in part on a consumer report. Specifically, before taking adverse action regarding the consumer's current or prospective employment, an employer must provide to the consumer a copy of the report and a written description of the consumer's rights under the FCRA. The employer must also provide the consumer with a reasonable period to respond to any information in the report that the consumer disputes and with written notice of the opportunity and time period to respond. A reasonable period for the employee to respond to disputed information is not required to exceed 5 business days following the consumer's receipt of the consumer report from the employer.

H.R. Rep. No. 103-486, 103d Cong., 2d Sess. 30 (1994).

In sum, the FCRA reflects Congress' concern with the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). It is clear from the statute's legislative history that Congress intended that the FCRA be construed to promote the credit

21

industry's responsible dissemination of accurate and relevant information and to maintain the confidentiality of consumer reports. To that end, it was Congress' judgment, as clearly expressed in §§ 1681b(b)(2) and (3), to afford consumers rights to information and privacy.

### d. The Impermissible Use Class

With the statutory text and legislative history in mind, it is necessary to determine whether Thomas, on behalf of the Impermissible Use Class, has alleged a concrete and particularized injury pursuant to 15 U.S.C. § 1681b(b)(2). As an initial matter, Defendants do not dispute that the injuries alleged by the Impermissible Use Class are "particularized," in the sense that each Impermissible Use Class member actually received a copy of the Employment Release Form from Defendants, and each has alleged a violation of his or her own statutory rights. Therefore, the remainder of the discussion herein addresses whether the injuries alleged by the Impermissible Use Class are "concrete," in accordance with Spokeo's directives.

In the Complaint, Thomas alleged that "Defendants did not provide Plaintiff with a written disclosure that they intended to obtain a copy of his consumer report for employment purposes," and that "Plaintiff did not provide Defendants with

his written authorization for them to obtain his consumer report for employment purposes." (ECF No. 1 at 5, ¶¶ 37-38).[3]

In determining whether a statutory violation has caused a "concrete" injury (as opposed to a "bare procedural violation"), it is helpful to first examine the nature of the interests that the statute creates. See 13A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3531.4 (3d ed. 2008) (noting that "the question whether there is an injury quickly becomes blended with the question whether to recognize the asserted interest that has in fact been impaired."). Here, it is clear that § 1681b(b)(2) creates two related but distinct statutory rights: first, a legally cognizable right to receive a disclosure that is clear, conspicuous, and unencumbered by extraneous information; and second, a right to the privacy of one's personal information, which an employer may not invade without first providing the above information and obtaining the consumer's express written consent.

Having identified the interests that § 1681b(b)(2) seeks to protect, it becomes clear that Thomas, on behalf of the

---

[3] During discovery, Defendants adduced evidence that Thomas received and signed the Employment Release Statement. For his part, Thomas testified that the document was placed in front of him and he was told to sign it (which he did). However, that factual issue is not significant to the standing claim, because the claim is that the Employment Release Statement was not a "clear and conspicuous" disclosure and that it does not contain a proper authorization.

Impermissible Use Class, has alleged two concrete injuries. First, Thomas has alleged a concrete informational injury: that is, Thomas has alleged that he was deprived of a clear disclosure stating that Defendants sought to procure a consumer report before the report was obtained. Importantly, the Supreme Court in Spokeo confirmed its previous holdings in Federal Election Comm'n v. Akins[4] and Public Citizen v. Department of Justice,[5] both of which teach that Congress may create a legally cognizable right to specific information, the deprivation of which constitutes a concrete injury sufficient to satisfy Article III. 136 S. Ct. at 1549-50. In those cases, the Supreme Court found standing where the plaintiffs sought to obtain, and were denied, information that was subject to public disclosure under the Federal Election Campaign Act and the Federal Advisory Committee Act, respectively.

Similarly, in Havens Realty Corp. v. Coleman, the Supreme Court held that the plaintiffs (individuals "who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices,") had suffered a concrete injury under the Fair Housing Act when they received untruthful housing information, even though they did not seek to use the

---

[4] 524 U.S. 11, 20-25 (1998).

[5] 491 U.S. 440, 449 (1989).

information for any purpose other than litigation.   455 U.S. 363, 373 (1982).  The Supreme Court held that, regardless of the plaintiffs' motives, Congress had created "an enforceable right to truthful information concerning the availability of housing," and that a "tester who has been the object of a misrepresentation made unlawful under [the Fair Housing Act] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions."  Id.

In the wake of Havens, Akins, and Public Citizen, it is well-settled that Congress may create a legally cognizable right to information, the deprivation of which will constitute a concrete injury.  By extension, it is well within Congress' power to specify the form in which that information must be presented.  Many courts, including this one, have explicitly or implicitly recognized this point.  See, e.g., Charvat v. Mutual First Fed. Credit Union, 725 F.3d 819, 824 (8th Cir. 2013), cert. denied, 134 S. Ct. 1515 (2014) (finding that deprivation of the proper form of information required by the Electronic Fund Transfer Act ("EFTA") confers standing); Manuel v. Wells Fargo Bank, Nat. Ass'n, 123 F. Supp. 3d 810, 817-18 (E.D. Va. 2015) (same, under the FCRA); Amason v. Kangaroo Express, 2013 WL 987935, at *3-*4 (N.D. Ala. Mar. 11, 2013) (same, under the Fair and Accurate Credit Transactions Act ("FACTA")).

In the FCRA, Congress has provided that an applicant for employment must receive notice that an employer seeks to procure the applicant's consumer report, and has specified that that notice must be "clear," "conspicuous," and "in a document consisting solely of the disclosure." 15 U.S.C. § 1681b(b)(2)(A)(i). In Congress' legislative judgment, where the disclosure does not satisfy these requirements, the consumer has been deprived of a fully appreciable disclosure to which he or she is entitled under the FCRA.[6] See Spokeo, 136 S. Ct. at 1549 (noting the importance of legislative judgment to the standing analysis); Havens, 455 U.S. at 373 (same). Therefore, where a consumer alleges, as Thomas has here, that he or she has

---

[6] Although the Court need not second-guess Congress on this point, the requirements of § 1681b(b)(2)(a) are well-grounded in professional literature:

> If information is not provided in a clear and usable form, it may actually make people less knowledgeable than they were before, producing overreactions, or underreactions, based on an ability to understand what the information actually means. People also face a pervasive risk of 'information overload,' causing consumers to treat a large amount of information as equivalent to no information at all. Certainly this is true when disclosure campaigns are filled with details that cannot be processed easily.

Cass R. Sunstein, Informational Regulation and Informational Standing: Akins and Beyond, 147 U. PA. L. REV. 613, 627-28 (1999) (footnotes omitted).

received a disclosure that does not satisfy those requirements, the consumer has alleged a concrete informational injury.

Second, the Impermissible Use Class members have alleged a violation of their statutorily created right to privacy and confidentiality of their personal information. The FCRA provides that an employer may not obtain an applicant's consumer report, thereby invading his or her statutory right of privacy, unless the employer first obtains the consumer's knowing and voluntary written consent to secure that information, as required by § 1681b(b)(2)(A). The common law has long recognized a right to personal privacy, and "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." United States Dept. of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 763 (1989) (defining "private" as "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public"). Moreover, as the Supreme Court has observed, the right to privacy in compilations of personal information is particularly powerful because the "power of compilations to affect personal privacy that outstrips the combined power of the bits of information contained within." Id. at 765. Accordingly, it has long been the case that an unauthorized dissemination of one's personal information, even without a

27

showing of actual damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue. See generally Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 HARV. L. REV. 193 (1890).

Similarly, it is well-settled that Congress may create a statutory right to privacy in certain information that strengthens or replaces the common law,[7] and citizens whose statutory right to informational privacy has been invaded may bring suit under the statute to vindicate that right. See, e.g., 18 U.S.C. § 2707(c) (authorizing statutory damages for violations of the Electronic Communications Privacy Act of 1986 ("ECPA")); 12 U.S.C. § 3417 (statutory damages available under the Right to Financial Privacy Act ("RFPA")); 18 U.S.C. § 2710(c)(1) (establishing a private right of action under the Video Privacy Protection Act ("VPPA")). Furthermore, where a defendant fails to comply with statutory prerequisites protecting the plaintiff's privacy, the plaintiff's privacy has

---

[7] Indeed, in the case of the FCRA, Congress explicitly preempted suits for invasion of privacy, "except as to false information furnished with malice or willful intent to injure [the] consumer." 15 U.S.C. § 1681h(e); see also Myers v. Bennett Law Offices, 238 F.3d 1068, 1074 (9th Cir. 2001) ("When a consumer brings an action for violation of the disclosure provisions of the FCRA, the Act's purpose of protecting consumer confidentiality is implicated. In that respect, such cases are akin to invasion of privacy cases under state law--cases where the plaintiff alleges that the defendant unlawfully invaded the plaintiff's privacy by obtaining information deemed confidential.") (collecting cases).

been unlawfully invaded and he has suffered concrete injury, regardless of actual damages. See, e.g., In re Nickelodeon Consumer Privaacy Litig., -- F.3d --, 2016 WL 3513782, at *7 (3d Cir. June 27, 2016) (noting that "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private") (footnote omitted); Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir. 2014) (holding that the plaintiffs suffered a concrete injury-in-fact when defendant sold plaintiffs' information to third parties in violation of the VPPA); Coelter v. Hearst Commc'ns, Inc., -- F. Supp. 3d --, 2016 WL 3369541, at *3 (S.D.N.Y. June 17, 2016) (same); Johnson v. Navient Sols., Inc., -- F. Supp. 3d --, 2015 WL 8784150, at *2 (S.D. Ind. Dec. 15, 2015) (finding standing based on a violation of the plaintiff's statutory right to privacy created by the Telephone Consumer Protection Act ("TCPA")); United States v. Koranki, 2015 WL 4394947, at *1 (W.D. Okla. July 16, 2015) (finding that the government's failure to follow necessary procedures before procuring bank customer's financial records invaded the customer's statutory right to privacy under the RFPA, which conferred standing); Cousineau v. Microsoft Corp., 992 F. Supp. 2d 1116, 1122-23 (W.D. Wash. 2012) (finding an invasion of privacy sufficient to

29

constitute injury-in-fact where defendant collected smartphone user's location data without her consent).

Here, Thomas, on behalf of himself and the class, has alleged that Defendants invaded the statutory right to confidentiality of his personal information by obtaining his consumer report without first providing the required disclosure or obtaining his written consent, as required by § 1681b(b)(2)(A). This allegedly unauthorized disclosure of personal information constitutes an invasion of the statutory right to privacy and a concrete injury sufficient to confer Article III standing.

Defendants have repeatedly argued, both in their briefs and at oral argument, that the Complaint alleges only a "bare procedural violation" insufficient to confer standing because Plaintiffs are not seeking actual damages, and because the class members who have been deposed uniformly acknowledged as much at their depositions. (Def. Mem. at 24; ECF No. 155 at 15). That argument is unavailing, for four reasons.

First, the rights created by § 1681b(b)(2) are substantive rights, and the breach of the statute is not a "bare procedural violation" of a technical requirement. Second, the argument misunderstands the holding in Spokeo, wherein the Supreme Court explicitly noted, citing Akins and Public Citizen, that "the violation of a procedural right granted by statute can be

sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any additional harm [e.g., actual damages] beyond the one Congress has identified." Spokeo, 136 S. Ct. at 1549 (emphasis in original). The Supreme Court also reiterated in Spokeo that "the risk of real harm" may satisfy the concreteness requirement. Id. Neither of those categories of concrete injuries necessarily entails proof of actual damages.

Third, Defendants' argument runs contrary to firmly-rooted principles of Anglo-American law, which has long allowed nominal damages where actual damages are too small or difficult to quantify. For example, it is black letter law that a property owner may sustain a cause of action for trespass regardless of whether the trespasser actually damaged the property in question. See, e.g., Restatement (Second) of Torts § 163 (1977). Similarly, a contracting party may sue for breach of contract, even if the contracting party was not harmed by the breach. See, e.g., Restatement (Second) of Contracts § 328 (1932).

Finally, Defendants' argument would require the Court to override clear Congressional intent. The FCRA provides that:

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

31

> (1)(A) any actual damages sustained by the
> consumer as a result of the failure or
> damages of not less than $100 and not more
> than $1,000...

15 U.S.C. § 1681n(a) (emphasis added). Thus, Congress
explicitly provided for actual damages as an alternative to, not
a prerequisite for, the recovery of statutory damages. Clearly,
Congress understood that actual damages in the case of an FCRA
violation may be difficult to quantify or prove. Accordingly,
statutory damages are available to plaintiffs, like the
Impermissible Use Class members here, who have suffered concrete
harm, but may find it difficult to prove actual damages.

For the foregoing reasons, the motion to dismiss the
claims of the Impermissible Use Class members for lack of
standing will be denied.

### e. The Adverse Action Sub-Class

Thomas has also alleged concrete injuries on behalf of the
Adverse Action Sub-Class.[8] Section 1681b(b)(3), like §
1681b(b)(2)(A), provides the consumer with a legally cognizable
right to specific information. Specifically, Congress provided
consumers against whom current or prospective employers are
contemplating adverse employment action with the right to
receive a copy of the report on which the adverse action is

---

[8] As is true for the Impermissible Use Class, the parties agree
that the alleged injury is particularized.

based and a summary of their rights under the FCRA before the contemplated adverse employment action is taken. Relatedly, this subsection provides consumers against whom adverse employment action is contemplated with a right to have time to discuss the reports with their current or prospective employers and to correct the reports if necessary before the contemplated adverse action is taken.

Thus, Thomas, for himself and the Adverse Action Sub-Class, has alleged two concrete injuries. First, by alleging that Defendants took adverse employment action without providing the information guaranteed by the statute, Thomas, on behalf of the Adverse Action Sub-Class, has alleged an informational injury. Every sub-class member had a statutory right to receive a copy of his or her consumer report and an FCRA summary of rights prior to Defendants' adverse action. No sub-class member received the required information. Therefore, Thomas, like every sub-class member, was deprived of information required by law to be disclosed, which constitutes a concrete injury sufficient to confer standing.

Moreover, Thomas and other sub-class members have also suffered a second concrete injury: they were deprived of the opportunity to "be confronted with the charges against [them] and tell [their] side of the story." Senate Report at 3. Even if all of the subclass members' consumer reports were entirely

correct (an unlikely scenario, given the errors that commonly pepper consumer reports despite the FCRA's protections), the sub-class members were deprived of the opportunity to explain any negative records in their consumer reports and discuss the issues raised in their reports with Defendants before suffering adverse employment action.[9]

For the foregoing reasons, the motion to dismiss the claims of the Adverse Action Sub-Class members for lack of standing will be denied.

### C. Defendants' Employment Release Statement Does Not Satisfy 15 U.S.C. § 1681b(b)(2).

The Court need not consider Defendants' argument concerning the Employment Release Form's compliance with § 1681b(b)(2)(A), because that argument exceeds the scope of the Order specifying the issues on which Defendants would be permitted to move for summary judgment a second time. (ECF No. 124). In any event, however, for the reasons set forth in a separate Memorandum Opinion, the Employment Release Statement provided to the Impermissible Use Class does not, as a matter of law, satisfy § 1681b(b)(2)(A). Accordingly, Defendants' motion for summary

---

[9] For some sub-class members, this deprivation may have ultimately cost them employment opportunities with Defendants. However, for purposes of this discussion, Plaintiffs need not show that their failure to obtain employment was directly traceable to Defendants' failure to comply with the FCRA, because the other concrete and particularized injuries discussed herein are sufficient to confer standing.

judgment as to the issue of liability under § 1681b(b)(2)(A) will be denied.

### D. Defendants are not Entitled to Summary Judgment on the Defense of Judicial Estoppel.

Finally, Defendants contend that they are entitled to summary judgment against Thomas because Thomas is barred by judicial estoppel from pursuing the claims made herein. (Def. Mem. at 27-30). Specifically, Defendants assert that judicial estoppel applies because Thomas was required to disclose his interest in this litigation during his previous bankruptcy proceedings and he failed to do so. Id.

The Fourth Circuit has characterized the doctrine of judicial estoppel as "an equitable doctrine that exists to prevent litigants from playing 'fast and loose' with the courts—to deter improper manipulation of the judiciary." Folio v. City of Clarksburg, W. Va., 134 F.3d 1211, 1217 (4th Cir. 1998) (quoting John S. Clark Co. v. Faggert & Frieden, P.C., 65 F.3d 26, 28-29 (4th Cir. 1995)). In order for the doctrine to apply,

> (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently.

Havird Oil Co., Inc. v. Marathon Oil Co., Inc., 149 F.3d 283, 292 (4th Cir. 1998) (citing Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996), cert. denied, 519 U.S. 1113 (1997)). "Judicial estoppel has often been applied to bar a civil law suit brought by a plaintiff who concealed the existence of the legal claim from creditors by omitting the lawsuit from his bankruptcy petition." Whitten v. Fred's, Inc., 601 F.3d 231, 241 (4th Cir. 2010) (citing Cannon-Stokes v. Potter, 453 F.3d 446, 448 (7th Cir. 2006) ("All six appellate courts that have considered this question hold that a debtor in bankruptcy who denies owning an asset, including a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends.")), abrogated on other grounds by Vance v. Ball State Univ., 133 S. Ct. 2434 (2013).

Importantly, however:

> Judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice."...It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts. Judicial estoppel is not a sword to be wielded by adversaries unless such tactics are necessary to "secure substantial equity."

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996) (internal citation omitted).

Federal bankruptcy law requires a debtor to list in the initial petition, inter alia, a "schedule of assets." 11 U.S.C. § 521(1). The Bankruptcy Rules require the schedules to be prepared as prescribed by the Official Forms. Fed. R. Bankr. P. 1007(b)(1). Official Form 6 requires a debtor to list "all personal property of the debtor of whatever kind," and property of a bankruptcy estate is defined broadly to include "all legal or equitable interests of the debtor in property as of commencement of the case." 11 U.S.C. § 541(a)(1). Moreover, "'the duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action.'" In re USinternetworking, Inc., 310 B.R. 274, 282 (Bankr. D. Md. 2004) (quoting In re Coastal Plains, Inc., 179 F.3d 197, 207-08 (5th Cir. 1999)).

A debtor also has the opportunity to voluntarily convert a case brought under Chapter 13 to a proceeding under Chapter 7 of the bankruptcy code at any time. 11 U.S.C. § 1307(a). Converting a case from Chapter 13 to Chapter 7 "does not effect a change in the date of the filing of the petition, the commencement of the case, or the order for relief." 11 U.S.C. § 348(a). After conversion, "property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor as of the

37

date of the conversion."   11 U.S.C. § 348(f)(1)(A).   However, "if the debtor converts a case [initially filed] under Chapter 13...in bad faith, the property of the estate in the converted case shall consist of the property of the estate as of the date of the conversion."   11 U.S.C. § 348(f)(2).   Therefore, "in a case converted from Chapter 13, a debtor's postpetition earnings and acquisitions do not become part of the new Chapter 7 estate."  Harris v. Viegelahn, 135 S. Ct. 1829, 1837 (2015).   In other words, "absent a bad-faith conversion, § 348(f) limits a converted Chapter 7 estate to property belonging to the debtor 'as of the date' the original Chapter 13 petition was filed." Id.

Accordingly, some courts have declined to apply judicial estoppel to plaintiffs whose claims accrued after the filing of their Chapter 13 petition, but before the bankruptcy was converted to Chapter 7, because the "post-petition claim...was not property of the estate for purposes of [the] Chapter 7 bankruptcy."  Sherman v. Wal-Mart Assoc., Inc., -- B.R. --, 2016 WL 1669019, at *3 (N.D. Tex. Apr. 25, 2016); see also Garcimonde-Fisher v. Area203 Marketing, LLC, 105 F. Supp. 3d 825, 835 (E.D. Tenn. 2015); Smith v. Scales Express, Inc., 2006 WL 2190575 (S.D. Ala. Aug. 2, 2006).   Those courts found that the debtor did not have a duty to disclose the newly pending claims in the conversion to Chapter 7 bankruptcy, and

38

therefore had not taken inconsistent positions that would warrant the application of judicial estoppel. Having held that the plaintiff had no duty to disclose the pending claims to the bankruptcy court, it necessarily follows that the plaintiff has not acted in bad faith. Smith, 2006 WL 2190575, at *3.

The same is true here. Thomas originally filed for bankruptcy under Chapter 13 of the Bankruptcy Code on October 16, 2009. (ECF No. 158-10, Docket of Bankruptcy Petition No. 09-36747-KLP). Thomas submitted his original schedules on November 2, 2009, and his Chapter 13 plan was confirmed on December 22, 2009. Id. Thomas subsequently twice amended his Chapter 13 plans; the amended plans were confirmed on August 12, 2010 and April 21, 2011. Id. The claims in this case accrued on March 12, 2012, when Thomas was denied employment without having received the pre-adverse action documents required by the FCRA. On October 1, 2013, the bankruptcy trustee moved to dismiss Thomas' bankruptcy petition for failure to make his payments as required under his Chapter 13 plan. Id. Accordingly, at a hearing held December 11, 2013, the bankruptcy court allowed Thomas 30 days to convert the bankruptcy proceeding to one under Chapter 7 to avoid dismissal. Id. In accordance with the bankruptcy court's order, Thomas filed a notice of voluntary conversion on January 10, 2014. Id. Defendants have offered no evidence to show that Thomas'

conversion was in bad faith.  On this record, it is not possible to find that the claims at issue here were ever part of the Chapter 7 estate.[10]  Therefore, Defendants have not shown that Thomas asserted a contrary position in the bankruptcy court, and they are not entitled to summary judgment on the issue of judicial estoppel.[11]

**CONCLUSION**

For the foregoing reasons, DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (ECF No. 156) will be denied.

It is so ORDERED.

/s/  *R&P*
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June **30**, 2016

_____

[10]  In accordance with the bankruptcy court's order, Thomas' attorney submitted amended schedules on March 6, 2014, after the proceeding had been converted to Chapter 7.  However, it appears that Schedule B, on which the debtor's personal property is listed, was inadvertently omitted from the filing.  (Case No. 3:09-BK-36747-KLP, ECF No. 107).  Defendants have made no showing from which the Court could infer that this apparent oversight was a result of bad faith on Thomas' part.  Therefore, the omission of Schedule B from Thomas' amended bankruptcy filings does not affect the result herein.

[11]  The parties agree that judicial estoppel, an equitable defense, is to be decided by the Court, sitting without a jury.